# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**UNITED STATES OF AMERICA**

                         **Plaintiff,**

**v.**                                                      **Case No: 6:00-cr-159-JA-DCI**

**CHARLES DAVID ZOHLMAN**

                         **Defendant.**

_____

## ORDER

Before the Court is the government's Motion for a Finding that a Sufficiently Important Government Interest Warrants Restoration of the Defendant's Competency to Stand Trial. Doc. 130 (the Motion). For the reasons stated in this Order, the Motion is **GRANTED**.

### I.   Background

On February 2, 2003, the Defendant pleaded guilty to three counts of bank robbery in violation of 18 U.S.C. § 2113(a). Docs. 39 and 42. The Court accepted the Defendant's guilty plea on February 25, 2003, adjudicated him guilty, and sentenced him on April 21, 2003, to 105 months in prison as to each count, the sentence on each count to run concurrently to the others. Docs. 44-47. The Court also ordered the Defendant's sentence to run concurrently with previously imposed sentences in the State of Florida. Docs. 46 and 47. In addition, the Court ordered the Defendant to serve a three-year term of supervised release upon his release from prison as to each count, with the terms to run concurrently to each other. *Id.*

On November 17, 2019, the Florida Department of Corrections Defendant released the Defendant from custody.

On November 26, 2019, the Court issued a warrant for the Defendant's arrest based upon a petition alleging that the Defendant violated his supervised release by failing to report to the United States Probation Office (USPO) within 72 hours of his release from prison.  Docs. 53; 56.

On December 4, 2019, state authorities arrested the Defendant for violations of his state probation.  Doc. 68 at 1-2.

On January 7, 2022, a state court sentenced the Defendant to 42 months' imprisonment with 766 days of credit for time served on multiple cases out of Brevard County, Florida.  *Id.*

On March 3, 2022, the government sought and obtained a writ of habeas corpus prosequendum seeking to have the Defendant brought into federal custody to face the USPO petition from November 2019.  Docs. 68; 69.

At the March 21, 2022, initial appearance on the Defendant's petition, the Court held a preliminary hearing and found no probable cause for the violation—the issue in dispute being whether, prior to his 2019 release from state prison, the Defendant received notice of the requirement to report to the USPO within 72-hours of his release by state prison authorities.  Thus, the Court dismissed the petition and directed the Defendant to report to the USPO within 72 hours of his release from state custody.  Docs. 73; 80.  The Defendant was then transferred back to state custody.

On March 19, 2023, the Court issued a warrant for the Defendant's arrest pursuant to a petition alleging the Defendant violated his supervised release by again failing to report to the USPO within 72 hours of his release from state prison.  Docs. 84; 86.  The Defendant was arrested on that warrant on June 6, 2023, at the Escambia County Jail.

At the Defendant's initial appearance in the Middle District of Florida on July 5, 2023, appointed counsel immediately raised issues concerning the Defendant's competency to proceed.

Doc. 89. The Defendant filed a motion to determine competency that, after a status conference, was referred to the undersigned for consideration. Docs. 97; 98.

On July 19, 2023, the Court held a hearing and granted the Defendant's Motion to Determine Competency and, pursuant to 18 U.S.C. §§ 4241 and 4247, committed the Defendant to the custody of the Attorney General for hospitalization and treatment to determine his competency. Doc. 102; 103.

On October 11, 2023, after obtaining a psychological evaluation report, the parties filed a joint notice that neither party would contest that the Defendant was incompetent to proceed, and both would jointly recommend that the Court order the Defendant be committed to the custody of the Attorney General for treatment towards competency restoration. Docs. 109; 111.

On October 26, 2023, The Court held a competency hearing and subsequently issued an order committing the Defendant to the custody of the Attorney General for hospitalization and treatment to determine whether there is a substantial probability that in the foreseeable future the Defendant will attain the capacity to permit the proceedings to go forward. Docs. 114; 115.

On September 24, 2024, the Mental Health Department of FMC-Butner issued a forensic evaluation report in which the forensic psychologist (i.e., Dr. Allyson Scharf, Ph.D.) stated that the Defendant "is currently suffering from a mental disease or defect, namely schizophrenia, which renders him not competent to stand trial." Doc. 119 (the Report) at 9. In addition, Dr. Shafer stated that the Defendant initially agreed to participate in a "trial of antipsychotic medication to address his symptoms of schizophrenia" but began refusing the medication shortly thereafter. *Id*. Dr. Shafer stated further that the treatment team believed there is a "substantial probability" that the Defendant's "competency to stand trial can be restored with appropriate treatment with antipsychotic medicine." *Id*. But given the Defendant's refusal to voluntarily accept the treatment

3

team's recommended pharmaceutical-based treatment, Dr. Shafer explained that the Court would have to "order treatment with psychotropic medication on an involuntary basis." *Id*. In the Report, Dr. Shafer correctly acknowledged that, pursuant to *Sell v. United States*, 539 U.S. 166 (2003), FMC-Butner could not medicate the Defendant without his consent unless the Court first determined that the four prerequisites outlined in *Sell* had been met. *Id*. Relatedly, Dr. Shafer recognized that the Court must begin moving forward by initially determining whether the first *Sell* prerequisite—important governmental interests—exists in the Defendant's case. *Id*.

On September 30, 2024, the government filed a motion requesting that the Defendant be held at FMC-Butner pending a determination concerning forcible mediation under *Sell*. Doc. 117. The Court set that motion for a hearing, noting that "the Defendant's presence is NOT required." Doc. 120. Nevertheless, the United States Marshals Service transported the Defendant to Orlando for the hearing, thus mooting the government's motion. Doc. 125. At the hearing, the Court set a briefing schedule for the initial phase of the *Sell* determination—i.e. the existence of "important governmental interests." *Id*. The government filed the Motion (Doc. 130), and the Defendant filed a response (Doc. 133). The matter is ripe for consideration.

## II.    Legal Standard

In *Sell*, the Supreme Court found that it was constitutionally permissible to administer antipsychotic medication to a mentally ill detainee in order to render him competent to stand trial if the United States shows by clear and convincing evidence: (1) the existence of "important governmental interests"; (2) that the "involuntary medication will significantly further those concomitant state interests"; (3) that the involuntary medication is "necessary" to further the important interests; and (4) that the administration of the medication is "medically appropriate, *i.e.*, in the patient's best medical interest in light of his medical condition." *Id*. at 180-81 (emphasis

omitted).  "The United States bears the burden of proving the necessary factual findings by clear and convincing evidence." *United States v. Chalifoux*, No. 6:21-CR-15-CEM-LHP, 2024 WL 4804829, at *11 (M.D. Fla. Aug. 27, 2024), *report and recommendation adopted*, 2024 WL 4803228 (M.D. Fla. Nov. 15, 2024) (citing *United States v. Diaz*, 630 F.3d 1314, 1331-32 (11th Cir. 2011)).

While there does not appear to be controlling authority holding that *Sell* applies to supervised release proceedings, the government cites authority for the proposition that Sell applies here.  *See* Doc. 130 at 10 (citing *United States v. Rodriguez*, 281 F. Supp. 3d 1284, 1293 (S.D. Fla. 2017) ("I am persuaded that the standard the Supreme Court set out in *Sell*, for authorizing involuntary medication of a mentally ill defendant for the purpose of restoring that defendant to competency, may be applied to a defendant charged with violation of the conditions of his supervised release."); *United States v. Baugh*, 776 F.Supp.2d 172, 177 (E.D. Va. 2011) (finding that the rule of *Sell* applies to supervised release revocation hearings, which are the "functional equivalent of a trial").  And, in his response, the Defendant does not contest the applicability of *Sell* to these proceedings.  Given that, the Court is persuaded by the reasoning in *Rodriguez* and *Baugh* and finds that the rule in *Sell* applies to proceedings concerning the petition to revoke the Defendant's supervised release.

"Before even applying the *Sell* factors, a district court first should consider whether involuntary medication is appropriate on the ground that the defendant poses a danger to himself or others.  Involuntary medication is permitted in those situations under *Washington v. Harper*, 494 U.S. 210 (1990)." *United States v. Ruark*, 611 F. App'x 591, 593 n.5 (11th Cir. 2015).  Neither party contends that the Defendant is currently a danger to himself or others.  Indeed, Dr. Shafer opined as follows in the Report:

> Despite his untreated psychotic symptoms, Mr. Zohlman has been free from aggressive or self-destructive behavior since his arrival at FMC Butner. He has not engaged in behavior which would pose a high risk of danger to himself or others. Thus, there is no convincing evidence Mr. Zohlman currently poses a substantial risk of dangerousness in the current conditions of his confinement at FMC Butner. Therefore, we opine Mr. Zohlman does not meet *Harper* criteria for involuntary treatment insofar as he is not gravely disabled, nor does he present an imminent risk of danger to himself or others in the hospital setting. Thus, the only mechanism by which the Bureau of Prisons (BOP) is able to pursue his treatment is for this Court to make a ruling within the parameters established in *Sell v. United States*.

Doc. 119 at 9. The Court has not been presented with any evidence contrary to Dr. Shafer's opinion. In fact, while the government "is concerned about the Defendant's previous criminal convictions that involved violent threats, his recent violent threats towards the Court and others, and his explosive behavior in the courtroom requiring the Court to order him removed, the United States has no additional information to dispute the Report's conclusion that the Defendant does not meet the criteria set forth in *Harper* for involuntary medication." Doc. 130 at 7. As a result, *Harper* does not provide a basis for involuntary medication. Therefore, the Court will proceed with the United States' request that it determine whether the first *Sell* factor—important governmental interests—is satisfied.

"The Government's interest in bringing to trial an individual accused of a serious crime is important." *Sell*, 539 U.S. at 180. "Thus, if a crime of which [the defendant] is accused is 'serious,' then the government's interest in prosecuting [the defendant] is 'important.'" *United States v. Fuller*, 581 F. App'x 835, 836 (11th Cir. 2014). However, the government's interest in prosecuting persons charged with serious crimes can be mitigated with special circumstances. *Sell*, 539 U.S. at 180.

### III.    Discussion

As will be discussed in the following sections, the Court finds that the rule in *Sell* should be applied to these proceedings concerning the petition to revoke the terms of the Defendant's

supervised release, that there exists an important governmental interest, and that special circumstances do not mitigate the governmental interest here.

    *a.*      *Seriousness of the Alleged Offense*

"Neither the Supreme Court, nor the Eleventh Circuit, has provided the appropriate standard to apply when determining whether an offense is 'serious.'" *United States v. Francis*, No. 8:19-CR-9-T-60SPF, 2020 WL 4925323, at \*2 (M.D. Fla. Aug. 21, 2020) (citing *United States v. Rodriguez*, 281 F. Supp. 3d 1284, 1293 (S.D. Fla. 2017) (noting the lack of controlling case law). There is a "debate among our sister circuits about whether the seriousness of a crime is measured by the statutory maximum [penalty] or the likely guideline sentence, or both." *United States v. Dillon*, 738 F.3d 284, 292 (D.C. Cir. 2013). "The Second, Fourth, Fifth, Sixth, and Eighth Circuits, for example, place the greatest weight on the maximum penalty authorized by statute." *Francis*, 2020 WL 4925323, at \*2 (citing *Rodriguez*, 281 F. Supp. 3d at 1293-94); *see United States v. Mackey*, 717 F.3d 569, 573 (8th Cir. 2013) ("we agree with those circuits that place the greatest weight on the maximum penalty authorized by statute"); *United States v. Gutierrez*, 704 F.3d 442, 451 (5th Cir. 2015) ("we follow the approach of several other circuits in comparing the time already served by [defendant] with the statutory maximum authorized for his indicted offenses"); *United States v. Green*, 532 F.3d 538, 550 (6th Cir. 2008) ("we conclude that a district court may rely on the potential statutory penalty to determine whether the crime meets the 'serious' requirement"); *United States v. Evans*, 404 F.3d 227, 237 (4th Cir. 2005) ("it is appropriate to focus on the maximum penalty authorized by statute in determining if a crime is 'serious'"); *United States v. Gomes*, 387 F.3d 157, 160-61 (2d Cir. 2004) (considering the statutory mandatory minimum and maximum sentences the defendant faced in considering the seriousness of the offense charged).

On the other hand, the Ninth Circuit has concluded that "the likely guideline range is the point for the analysis of a crime's seriousness" because it is "the best available predictor of the length of a defendant's incarceration." *United States v. Hernandez-Vasquez*, 513 F.3d 908, 919 (9th Cir. 2008). The Tenth Circuit has explained that "whether a crime is 'serious' relates to the possible penalty the defendant faces if convicted, as well as the nature or effect of the underlying conduct for which he was charged." *United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1226 (10th Cir. 2007) (considering statutory maximum penalty and potential advisory guideline imprisonment range in determining if charged offense is "serious").

Thus, most of the circuit courts to have considered this issue favor the statutory maximum instead of the Sentencing Guidelines as a measure of seriousness. That is "because the Sentencing Guidelines are not determined with certainty until after a defendant has been convicted, they are not binding on the court, and they reflect the views of the Sentencing Commission rather than Congress." *Rodriguez*, 281 F. Supp. 3d at 1294. The Court agrees with the majority of circuits that have addressed this issue and finds that the best objective measure of the seriousness of the alleged offense is the maximum penalty authorized by statute.

Here, the Defendant pled guilty to three counts of bank robbery, each of which carried a maximum term of imprisonment of twenty years. The Court sentenced the Defendant to 105 months in prison as to each count, with the sentences to run concurrently to each other. The Defendant also received three years of supervised release as to each count, with the terms running concurrently to each other. The "offense" here for purposes of the first *Sell* factor analysis is the violation of supervised release—that is the "charge" the defendant now faces and if there is a "trial" or sentencing, it would be on that "charge" and governed by the penalties applicable to the violation. The nature of the specific violation is a failure to report to the USPO within 72 hours

8

of release from custody; the second such violation, and one that is also in direct contravention of the Court's March 21, 2022, admonishment to the Defendant that he report to the USPO as required when he was released from state custody. For the charged violation, the Defendant faces a statutory maximum of six years in prison—the violation carries a two-year maximum as to each count, and the Court could run those three two-year terms consecutively. That said, the guidelines range for the violation is 8-14 months in prison. In addition, the Defendant's current term of supervised release is not set to expire until February 2026.

Considering the statutory maximum penalty and the nature or effect of the underlying conduct for which the Defendant is charged, the Court finds that the Defendant is facing a serious offense that establishes an important governmental interest. Still, the Court must determine whether special circumstances lessen the government's interest in prosecuting an otherwise serious violation of supervised release.

      *b.*    *Special Factors*

In *Sell*, the Supreme Court stated that courts "must consider the facts of the individual case in evaluating the Government's interest in prosecution" and noted that "[s]pecial circumstances may lessen the importance of that interest." 539 U.S. at 180*; see also United States v. Pfeifer*, 661 F. App'x 618, 620 (11th Cir. 2016). "The Government's interest may be diminished under '[s]pecial circumstances,' such as the possibility of civil commitment amounting to lengthy confinement which could 'diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime,' or 'the possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed ...).'" *United States v. Gillis*, No. 3:11-CR-18-J-34JBT, 2011 WL 7109362, at

*5 (M.D. Fla. Nov. 30, 2011) (quoting *Sell*, 539 U.S. at 180), *report and recommendation adopted as modified*, 2012 WL 254019 (M.D. Fla. Jan. 27, 2012).

     1.   <u>Civil Commitment</u>

The Eleventh Circuit has recognized that "[c]ivil commitment may diminish the risks attached to releasing an accused criminal without punishment." *Ruark*, 611 F. App'x at 598. Here, the parties appear to agree that civil commitment is not a likely possibility due to Dr. Sharf's opinion that the Defendant does "not meet the threshold for civil commitment at this time." *Id.* at 9. The government concedes this. Doc. 130 at 13. Thus, "because there is no evidence as to the likelihood of civil commitment, the important governmental interest in this prosecution is not diminished." *Francis*, 2020 WL 4925323, at *3 (citing *Ruark*, 611 F. App'x at 598 (no special circumstances diminished the importance of the governmental interest where there was "no evidence as to his likelihood of civil commitment")).

     2.   <u>Time Served</u>

"In *Sell*, the Supreme Court also observed that if the defendant has been confined for a lengthy period of time, for which he would receive credit for any sentence ultimately imposed, that this might lessen the government's interest in his adjudication." *Francis*, 2020 WL 4925323, at *4 (citing 539 U.S. at 180). In an unpublished opinion, a panel of the Eleventh Circuit stated that the length of pretrial detention may diminish the government's interest "if an individual serves time equal to or greater than his likely sentence if found guilty." *Ruark*, 611 F. App'x at 598. In another unpublished opinion, a panel of the Eleventh Circuit held that the government met its burden of showing an important interest in medicating the defendant despite the district court's acknowledgement that the defendant's 14-month stay in prison amounted to a "sizeable portion of his expected sentence." *Pfeifer*, 661 F. App'x at 620. Other courts have compared the length of

pretrial detention to the maximum sentence. For example, in *Evans*, the defendant—who asserted his guidelines range was likely between 14 and 20 months—had served more than two years in pretrial confinement. 404 F.3d at 237–39.

In the Motion, the government notes that much of the length of in-custody time here has been due to logistical challenges concerning the competency evaluation and restoration process, as well as the nature of that process itself. The government argues those delays do not lessen the government's interest in adjudication on the violation petition. Further, the government contends that "the Defendant's time-served will not be close to his potential maximum penalty of six years imprisonment, and years will remain on the Defendant's sentence of supervision, which is not set to expire until February 2026." Doc. 130 at 14.

In his response, the Defendant notes that he has been in custody on the violation petition since June 6, 2023. As of the date of this Order, that is 584 days, or about 19 months. The advisory Guidelines range for the violation is 8 to 14 months. Accordingly, the Defendant notes that he has been held more than double the low end of the Guidelines range, and several months more than the high end. And while the Defendant concedes he faces a sentence of 72 months, "it is hard to imagine that a single violation for failure to register would justify a 72 month sentence." Doc. 133 at 5.

Here, both parties have a point. The Court cannot disagree that—in the mill-run case—a sentence of 72 months for a single violation for failure to report to the USPO would be unlikely. And it is true that the Defendant has already been detained in this case over 19 months, and that a time-served sentence already exceeds the advisory Guidelines applicable to him. But the government is also correct that the Defendant faces six years of imprisonment. And that the Defendant also faces a current term of supervised release that does not expire until February 2026.

11

Relatedly, the Defendant has arguably not served a single day of supervised release—he has never reported to the USPO to be supervised. Thus, on the balance, the special circumstance of the time the Defendant has already served does not dilute the government's interest in adjudication of the violation petition. Especially where, as here, the Defendant has a significant term of supervised release remaining on his sentence and the Defendant has never complied with the terms of his supervised release because he has never reported to the USPO despite a subsequent court order that he do so.

3.    Nature of the Crime

With respect to this first *Sell* prerequisite, courts "must consider the facts of the individual case in evaluating the government's interest in prosecution." *Fuller*, 581 F. App'x at 836 (quoting *Sell*, 539 U.S. at 180). Here, as the violation, on its face, is relatively minor. But, as discussed in the foregoing section, the violation effectively prevented the Defendant from ever being supervised—he simply failed to report to the USPO, so he was never supervised and never complied with a critical part of his sentence—the term of supervised release. Accordingly, the undersigned does not find that the nature of the offense lessens the government's interests here.

IV.    **Conclusion**

Accordingly, it is **ORDERED** that:

1.    the Motion for a Finding that a Sufficiently Important Government Interest Warrants Restoration of the Defendant's Competency to Stand Trial (Doc. 130) is **GRANTED**;

2.    the United States Bureau of Prisons shall file a report addressing the remaining three prongs of the *Sell* test by no later than February 10, 2025; and

12

3.      the parties shall confer and, on or before January 24, 2025, provide a proposed schedule for the remaining proceedings concerning *Sell*, including proposed dates for an evidentiary hearing and a proposed briefing schedule.

**ORDERED** in Orlando, Florida on January 10, 2025.

DANIEL C. IRICK
UNITED STATES MAGISTRATE JUDGE