UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No. 6:00-cr-159-JA-DCI

CHARLES DAVID ZOHLMAN

## ORDER

Since at least his adolescence, Defendant, Charles David Zohlman, has been afflicted with mental health issues, including schizophrenia. (Doc. 85-1 at 32). He is now 56 years old and incompetent to participate in proceedings initiated by the Government to prosecute his alleged violation of supervised release—failing to timely report to the federal probation office after his release from custody. (Doc. 85). The Government requests the Court's permission to forcibly inject Mr. Zohlman with haloperidol decanoate—an antipsychotic drug—in the hope of restoring Mr. Zohlman's competency so that he can participate in the proceeding against him. (*See* Doc. 84; Doc. 130).

The assigned magistrate judge has issued a Report and Recommendation (R&R, Doc. 160), recommending that the Government's request be granted. Mr. Zohlman objects, arguing that the Government has failed to satisfy the requirements of *United States v. Sell*, 539 U.S. 166 (2003), and thus forcible injection would violate his constitutionally protected liberty interests. (*See* Doc.

164). Because the Government has failed to show that it has an important interest in prosecuting Mr. Zohlman's supervised-release violation, his objection must be sustained.[1]

## I.    BACKGROUND

### A.    August 4, 2000–June 6, 2023

Mr. Zohlman committed three bank robberies in a twelve-day span in August 2000. (*See* Presentence Investigation Report, Doc. 85-1 at 16–38). The robberies were unusual in that Mr. Zohlman did not use a weapon or make any direct threats. (*Id.* at 19–21 ¶¶ 5–12). On each occasion, he handed a bank teller a note instructing the teller to give him money and not to give him a dye pack. (*Id.*). He suggested to the tellers that no one would get hurt if they followed his instructions. (*Id.*). A police officer arrested Mr. Zohlman after seeing him walking away from the third bank. (*Id.* at 21 ¶ 12).

The United States indicted Mr. Zohlman for the three robberies in September 2000. (Doc. 1). Prosecution in federal court was initially delayed because of pending state charges for the same robberies, (Doc. 85-1 at 21 ¶ 16), but Mr. Zohlman entered a guilty plea to all three robberies in February 2003, (*see* Docs. 39, 42, & 44). The presentence investigation report revealed that Mr.

---

[1] In addition to Mr. Zohlman's objection (Doc. 164), the Government's response (Doc. 167) and arguments made by the parties in open court on September 4, 2025, (see mins., Doc. 170) have been carefully considered.

Zohlman had committed twelve criminal offenses when he was between the ages of 20 and 29, resulting in 23 criminal history points and placing him in criminal history category VI. (Doc. 85-1 at 24–30). His total offense level was 22, resulting in a guideline sentencing range of 84 to 105 months' imprisonment followed by up to three years of supervised release. (*Id.* at 34–35). The presentence investigation report also disclosed that Mr. Zohlman had received mental health treatment "off and on since he was fifteen years old" and had been diagnosed with depression and schizophrenia. (*Id.* at 32). He had been prescribed various medications and he was medicated when sentenced. (*Id.*).

On April 21, 2003, Mr. Zohlman was sentenced to terms of 105 months on each count of bank robbery, to be served concurrently with one another and concurrently with sentences that had not yet been imposed in the Florida state cases, 2000-CF-42189, 2000-CF-42190, and 2000-CF-41898. (Judgment, Doc. 46). He was required to serve three years of supervised release for each count, with all three supervised-release terms to be served concurrently with one another. (*Id.* at 3). After Mr. Zohlman was sentenced in this Court, the Florida state court sentenced him to a term of 20 years' imprisonment followed by 10 years' probation. (*See* Doc. 85; Doc. 171 at 2).

Mr. Zohlman served his federal and state sentences concurrently, and the Florida Department of Corrections released him on November 17, 2019. (Doc.

141 at 2). Nine days later, the magistrate judge issued a warrant for Mr. Zohlman's arrest based on the federal probation office's petition alleging that he had violated the conditions of his supervised release by failing to report to its office within 72 hours of his release. (Docs. 53 & 56). On December 4, 2019—before the federal warrant was served—state authorities arrested him for violating his state probation by failing to report to the state probation office. (Doc. 68 at 1–2). The state court sentenced him to an additional 42 months in prison for that violation. (*Id.*).

In March 2022—while Mr. Zohlman was serving his state violation-of-probation sentence—the Government obtained a writ ordering that he be brought to federal court to answer the November 2019 petition. (Docs. 68 & 69). But at the preliminary hearing on that petition, the magistrate judge dismissed it without prejudice after finding that the Government had not established probable cause that Mr. Zohlman received notice of his obligation to report to the federal probation office within 72 hours of his release from the Florida Department of Corrections. (Doc. 80). To ensure Mr. Zohlman was notified of his obligations moving forward, the magistrate judge explained to him that he was required to report to the federal probation office within 72 hours of his release from state custody. (Docs. 73 at 2). The Government then returned him to state custody to serve the remainder of his state violation-of-probation sentence. (*Id.*).

Mr. Zohlman completed his state violation-of-probation sentence and was released by the Florida Department of Corrections on March 4, 2023. (Doc. 85 at 1). But he allegedly again failed to report to the federal probation office within 72 hours of his release, prompting the filing of a second petition alleging that he violated supervised release on March 14, 2023. (*Id.*). The magistrate judge issued another warrant for Mr. Zohlman's arrest, (Doc. 87), which was executed on June 6, 2023, (Doc. 88).

**B.    June 7, 2023—April 25, 2025**

Mr. Zohlman made his initial appearance on the present violation-of-supervised-release petition on July 5, 2023. (Doc. 89). His appointed counsel immediately raised concerns as to whether he was competent to proceed. (*See id.*). A few weeks later, the magistrate judge granted defense counsel's motion to determine competency and committed Mr. Zohlman to the custody of the Attorney General for hospitalization and treatment pursuant to 18 U.S.C. §§ 4241 and 4247. (Docs. 102 & 103).

After evaluating Mr. Zohlman during July and August 2023, Dr. Lesli Johnson, a psychologist for the Bureau of Prisons, prepared a report in September 2023 in which she determined that "there is objective evidence to indicate that Mr. Zohlman does suffer from . . . schizophrenia." (Johnson Report, Doc. 109, at 12). And she reported that Mr. Zohlman's schizophrenia "impairs

his ability to understand the nature and consequences of the court proceedings against him, as well as his ability to aid and assist counsel." (*Id.*). Based on Dr. Johnson's report, the parties stipulated that Mr. Zohlman be committed to the custody of the Attorney General for treatment to restore his competency. (Doc. 111). The magistrate judge granted the parties' request, and Mr. Zohlman was transferred to the Federal Medical Center in Butner, North Carolina (FMC–Butner) in October 2023. (Docs. 114 & 115).

Eleven months later, the Mental Health Department at FMC–Butner issued a report authored by forensic psychologist Dr. Allyson Sharf, which concluded that Mr. Zohlman "is currently suffering from . . . schizophrenia, which renders him not competent to stand trial." (Forensic Evaluation, Doc. 119, at 9). Dr. Sharf concluded that there was a "substantial probability . . . that Mr. Zohlman's competency to stand trial c[ould] be restored . . . with antipsychotic medicine" but noted that Mr. Zohlman "refus[es] to accept recommended medication treatment on a voluntary basis." (*Id.*).

FMC–Butner could not involuntarily medicate Mr. Zohlman absent a court order. On November 13, 2024, the Government filed a Motion for a Finding that a Sufficiently Important Government Interest Warrants Restoration of the Defendant's Competency to Stand Trial (Doc. 130). That motion was referred to the assigned magistrate judge. In January 2025, the magistrate judge ruled that

the Government had an important interest in restoring Mr. Zohlman's competency. (Doc. 134). The magistrate judge then held an evidentiary hearing in April 2025 to assess whether Mr. Zohlman should be involuntarily medicated. (Doc. 152; Doc. 157).

During the hearing, the magistrate judge heard medical testimony from Dr. Sharf and from Dr. Charles A. Cloutier, M.D., who prepared a forensic addendum report. (Doc. 145). Dr. Cloutier testified that a long-lasting injectable formulation of haloperidol decanoate would likely restore Mr. Zohlman's competency and that, while neurological and metabolic side effects are possible, serious side effects are rare. (Doc. 157 at 33:19–34:9, 40:22–42:21). But Dr. Cloutier noted that the years Mr. Zohlman was untreated and his poor understanding of his illness could reduce the effectiveness of the treatment. (*Id.* at 57:5–13).

Dr. Cloutier also testified about the protocol that the Bureau of Prisons follows when forcibly medicating an inmate. (*Id.* at 58:18–20). He explained that the involuntary medication process takes place in stages that give the patient multiple opportunities to voluntarily comply. It gradually escalates in invasiveness when patients continually refuse treatment. At the outset, a physician offers the patient oral medication and informs the patient that a court has ordered the patient to take it. (*Id.* at 60:13–16). If the patient refuses, "a

five-member team of custody staff and a mental health lieutenant," wearing protective gear, engages the patient at the patient's cell door for five minutes, attempting to persuade the patient to take the medicine. (*Id.* at 60:17–61:3). If the patient still refuses, the officers enter the patient's cell and pepper-spray the patient. (Doc. 157 at 61:6–14). If, after repeatedly being pepper-sprayed, the patient still refuses to submit, then the five-member team physically restrains the patient. (*Id.* at 63:9–20). The patient, shackled in arm-and-leg restraints, is then seated on a chair and flanked on all sides by officers. (*Id.* at 63:21–64:9). A physician then administers the medication to the patient. (*Id.* at 64:11–22). Because under Dr. Cloutier's treatment plan Mr. Zohlman would receive the medication every two to four weeks for up to eight months, this process could play out up to sixteen times. (*Id.* at 65:18–66:21).

Following the evidentiary hearing, the magistrate judge issued the R&R (Doc. 160) finding that all *Sell* requirements were satisfied, including that the Government had an important interest in adjudication of the violation petition. (R&R at 12–17). Based on these findings, the R&R recommends that the Bureau of Prisons be permitted to involuntarily inject Mr. Zohlman with anti-psychotic drugs. (R&R at 25). Mr. Zohlman's objections to the R&R are now before the Court. (*See* Doc. 164).

## II.    STANDARD OF REVIEW

When a party objects to an R&R, the district court must "make a de novo determination of those portions of the report . . . to which objection is made." 28 U.S.C. § 636(b)(1). The district court must consider the record independent of the magistrate judge's report, as *de novo* review is "essential to the constitutionality of section 636." *Jeffrey S. v. State Bd. of Educ.*, 896 F.2d 507, 512 (11th Cir. 1990). The district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

## III.    LAW

"The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Washington v. Harper*, 494 U.S. 210, 229 (1990) (citing *Winston v. Lee*, 470 U.S. 753 (1985), and *Schmerber v. California*, 384 U.S. 757, 772 (1966)). To overcome a defendant's liberty interest and administer medication over a defendant's objection, the Government must either establish that the defendant is "dangerous to himself or others and the treatment is in the [defendant]'s medical interest," *id.* at 227, or establish the four factors set forth by the Supreme Court in *Sell*. There is no evidence that Mr. Zohlman is a danger to himself or others. (*See* Doc. 119 at 9). Thus, the question is whether the Government has established the four *Sell* factors.

Under *Sell*, the Government must establish by clear and convincing evidence: (1) the existence of an "important governmental interest[]"; (2) that the "involuntary medication will significantly further" the important governmental interest; (3) that involuntary medication is "necessary" to further the important governmental interest; and (4) that the administration of the medication is "medically appropriate, i.e., in the defendant's best medical interest in light of his medical condition." 539 U.S. at 180–81 (emphasis removed); *see also United States v. Diaz*, 630 F.3d 1314, 1332 (11th Cir. 2011) (agreeing with other circuits that the burden of proof is "clear and convincing evidence").

In evaluating the first prong of the *Sell* test—the existence of an important governmental interest—"courts must consider the facts of the individual case" because "[s]pecial circumstances may lessen the importance of that interest." *Sell*, 539 U.S. at 180. To satisfy the Constitution, the Government must show that it has an "essential" or "overriding" interest sufficient to overcome a defendant's "interest in avoiding involuntary administration of antipsychotic drugs." *Sell*, 539 U.S. at 178–79 (quoting *Riggins v. Nevada*, 504 U.S. 127, 134–35 (1992)). The *Sell* Court recognized that the circumstances under which involuntary injection is permissible "may be rare." *Id.*

10

Although the defendant in *Sell* was pending trial for a substantive offense, the Government notes that district courts have found *Sell* principles applicable in cases involving violations of supervised release. (*See* Doc. 130 at 10 (citing *United States v. Rodriguez*, 281 F. Supp. 3d 1284, 1293 (S.D. Fla. 2017), and *United States v. Baugh*, 776 F. Supp. 2d 172, 177 (E.D. Va. 2011))). The *Rodriguez* court agreed with the *Baugh* court that "nothing in the *Sell* opinion suggested the Supreme Court meant to confine its decision to adjudications at trial" and "that a supervised release hearing is the 'functional equivalent of a trial.'" 281 F. Supp. 3d at 1293 (quoting *Baugh*, 776 F. Supp. 2d at 177). Here, the parties appear to agree that *Sell* provides the proper standards in this case. (*See* Doc. 164; Doc. 167).

The *Sell* Court held that "[t]he Government's interest in bringing to trial an individual accused of a *serious crime* is important." 539 U.S. at 180 (emphasis added). But *Sell* does not define what constitutes a "serious crime," and the parties contest whether Mr. Zohlman's alleged violation of supervised release is "serious." In the context of initial criminal offenses—rather than supervised release violations[2]—the Second, Fourth, Fifth, Sixth, and Eighth circuits have placed the greatest weight on the maximum penalty authorized by statute; the

---

[2] I am unaware of any circuit-court authority addressing whether a violation of a condition of supervised release is considered a "serious" crime under *Sell*.

11

Ninth Circuit relies on the likely guideline range; and the Tenth Circuit applies a hybrid approach that considers both the possible penalty the defendant faces if convicted and the nature of the underlying conduct. *See United States v. Francis*, No. 8:19-cr-9-T-60SPF, 2020 WL 4925323, at *2 (M.D. Fla. Aug. 21, 2020) (collecting cases). The Eleventh Circuit has not weighed in on how to determine what constitutes a "serious" crime. *See id.* (citing *Rodriguez*, 281 F. Supp. 3d at 1293).

## IV.    DISCUSSION

In the R&R, the magistrate judge determined that the Government had established all four *Sell* factors. Mr. Zohlman objects to the R&R on several grounds, including that the Government has not established that it has an important interest in prosecuting Mr. Zohlman's alleged supervised-release violation. (Doc. 160). My *de novo* review begins and ends with assessment of the importance of the Government's interest in prosecuting Mr. Zohlman and whether "[s]pecial circumstances . . . lessen the importance of that interest." *Sell*, 539 U.S. at 180.

### A.    Seriousness of Alleged Offense

Mr. Zohlman's alleged failure to report to the federal probation office is a Grade C violation of supervised release—the least severe category of violation under the guidelines, *see* U.S.S.G. § 7C1.1(a)(3)—that carries a statutory maximum sentence of two years' imprisonment, *see* 18 U.S.C. § 3583(e)(3).

12

Because Mr. Zohlman was serving three terms of supervised release at the time of the alleged violation, the Government argues that he could be sentenced to two years' imprisonment for each of his three terms of supervised release and that he could be ordered to serve those sentences consecutively, resulting in a six-year statutory maximum sentence. Mr. Zohlman does not appear to contest this point. (*See* Doc. 133 at 5 ("[Mr. Zohlman] could always be sentenced to six years in prison, which would be the maximum penalty if the three statutory maximum penalties were to be stacked and run consecutively.")). Indeed, the Eleventh Circuit has held that district courts have discretion under 18 U.S.C. § 3584(a) to impose consecutive sentences of imprisonment after violation of concurrent terms of supervised release. *United States v. Quinones*, 136 F.3d 1293, 1295 (11th Cir. 1998).

The Government contends that a supervised-release violation that carries a six-year maximum sentence constitutes "a serious offense" that it has an important interest in prosecuting. (Doc. 167 at 5 (citing *United States v. Doten*, 699 F. Supp. 3d 1363, 1370 (S.D. Fla. 2023))). At least two district courts in this circuit have found offenses with possible sentences of less than six years' imprisonment to be "serious" under *Sell*. *See Rodriguez*, 281 F. Supp. 3d at 1295 (finding "the possible two-year statutory term of incarceration is a sufficiently lengthy period of incarceration to mark the offense as serious"); *Doten*, 699 F.

Supp. 3d at 1370 (determining an offense that carried "a statutory maximum sentence of five years" is "serious" under *Sell*). *But see United States v. Armstrong*, No. 3:12CR-36-S, 2014 WL 1257020, at *3 (W.D. Ky. Mar. 26, 2014) (finding that "the Grade C violation of which the defendant stands accused simply does not rise to the level which would justify the involuntary administration of medication over the defendant's strong objections").

It is generally reasonable to rely on the maximum sentence available for a substantive criminal offense in gauging the Government's interest in prosecuting that offense because it provides objectivity when a court knows little about the defendant or the circumstances of the offense. And it is reasonable in that context to contemplate that consecutive sentences for multiple criminal counts could be imposed. But in the posture of a supervised-release violation, a sentencing court knows much more about a defendant than at the outset of the case. By that point, the court has participated in a plea colloquy or heard trial evidence, and it will possess a presentence investigation report regarding the underlying criminal offense, the judgment with a statement of reasons, and the petition alleging the supervised-release violation with an accompanying report of the history of supervision. In view of these fundamental differences between a substantive criminal offense and a Grade C violation of supervised release, treating the maximum statutory penalty as the sole measure of seriousness is

14

tenuous.[3] *See United States v. Kourey*, 276 F. Supp. 2d 580, 585 (S.D. W. Va. 2003) (opining that the court "simply cannot find that the Supreme Court envisioned that its decision in *Sell* would be applied" where a "[d]efendant is charged with violating the terms and conditions of his supervised release" because the "[d]efendant is not facing serious criminal charges upon which he will be tried").

Moreover, consecutive sentences for a single violation of supervised release are rare, in part because during revocation hearings, courts are "required to consider the policy statements" in Chapter 7 of the sentencing guidelines. *See* 18 U.S.C. § 3553(a)(4)(B), (5); *United States v. Silva*, 443 F.3d 795, 799 (11th Cir. 2006); *United States v. Cook*, 291 F.3d 1297, 1301–02 (11th Cir. 2002). Applying those policy statements here results in an advisory guideline sentence of eight to fourteen months' imprisonment, and the guidelines do not appear to even contemplate consecutive sentences upon violation of supervised release. *See* U.S.S.G., ch. 7, pt. A, introductory cmt. 3(b). Instead of recommending consecutive sentences for multiple violations of supervised release, the guidelines state that "[w]here there is more than one

---

[3] "The opening provision of Title 18's sentencing chapter clearly uses 'offense' to refer to a criminal conviction" as opposed to "a violation of supervised release," which "need not be criminal." *Esteras v. United States*, 606 U.S. 185, 194 (2025) (first citing 18 U.S.C. § 3551(a); and then quoting *Johnson v. United States*, 529 U.S. 694, 700 (2000)).

violation of the conditions of supervised release, or the violation includes conduct that constitutes more than one offense, the grade of the violation is determined by the violation having the most serious grade." U.S.S.G. § 7C1.1(b).

Furthermore, the *Sell* Court describes a "serious crime" as one against a "person or . . . against property." 539 U.S. at 180. This case involves neither. Mr. Zohlman is accused of a breach of trust, not a crime against a person or property. *See* U.S.S.G. ch. 7, pt. A, introductory cmt. 3(b). But as discussed next, regardless of whether Mr. Zohlman's alleged offense is regarded as "serious," the special circumstances of this case diminish the Government's interest in prosecution.

### B.    Special Circumstances

*Sell* requires district courts to consider "the facts of the individual case in evaluating the Government's interest in prosecution" and cautions that "[s]pecial circumstances may lessen the importance of [the Government's] interest." *Sell*, 536 U.S. at 180. The extraordinary facts and special circumstances of this case mitigate the importance of the Government's interest here. As a result, the Government cannot carry its burden of showing by clear and convincing evidence that its interest is important enough to warrant forcibly injecting Mr. Zohlman.

*Sell* does not offer a comprehensive explanation of what circumstances might be considered "special," though it identifies a defendant being subject to civil confinement or having already been in custody for a significant length of time as fitting the bill. 539 U.S. at 180 (citing 18 U.S.C. § 3585(b)). Here, Mr. Zohlman has been in custody on the current supervised-release petition since June 2023. It is significant that Mr. Zohlman has already served more than the statutory maximum penalty allowed for a single Grade C violation of supervised release and double the high-end of the advisory guideline range of 8–14 months. *See* 18 U.S.C. § 3583(e)(3); U.S.S.G. § 7C1.5. Because Mr. Zohlman has already served a significant portion of any sentence that he might face, the Government's interest in proceeding with prosecution of the petition is significantly diminished.

Mr. Zohlman's alleged violation of supervised release is not to be taken lightly, but it is important to bear in mind that supervised release "is not a punishment in lieu of incarceration" but instead "'fulfills rehabilitative ends' and 'provides individuals with postconfinement assistance.'" *Esteras*, 145 S. Ct. at 2041 (first quoting *United States v. Granderson*, 511 U.S. 39, 50 (1994); and then quoting *United States v. Johnson*, 529 U.S. 53, 59–60 (2000)). Mr. Zohlman is accused of a single breach of trust by failing to report to the federal probation office. *See* U.S.S.G. ch. 7, pt. A, introductory cmt. 3(b). Absent a retributive

17

purpose, the Government's interest in prosecution is necessarily diminished in this context. *See, e.g., Armstrong*, 2014 WL 1257020, at *3 (finding that "the Grade C violation of which the defendant stands accused simply does not rise to the level which would justify the involuntary administration of medication over the defendant's strong objections"); *United States v. Jones*, No. 3:15-CR-184 (VAB), 2016 WL 3962776, at *2 (D. Conn. July 21, 2016) (finding that an alleged Grade C violation of supervised release "is not of sufficient importance to the Government to justify the forced imposition of medication").

Finally, the length of time Mr. Zohlman has served for the underlying robbery offenses is also a special circumstance to be considered in assessing the Government's interest. When I sentenced Mr. Zohlman in 2003, I took seriously my responsibility to craft a sentence satisfying the requirements of 18 U.S.C. § 3553 and imposed a sentence of 105 months. (*See* Doc. 45). But Mr. Zohlman has now served approximately 300 months in state and federal custody—almost three times the sentence I imposed—without committing another substantive offense. Thus, the Government's interest in revocation is diluted by the fact that Mr. Zohlman has already served an exorbitant amount of time in custody.

## V.    CONCLUSION

Mr. Zohlman was suffering from severe mental illness when he committed the robberies in August 2000. He is still severely mentally ill. Even though he

18

has not committed another crime, the Government wants to involuntarily medicate him by forcible injection so that it can prosecute him for an alleged Grade C supervised-release violation. However, "[t]he circumstances where forced mental health treatment is justified are rare, and [they] do not exist here." *Jones*, 2016 WL 3962776 at *2 (citing *Sell*, 539 U.S. at 179–80).

The strength of any interest the Government might have in prosecuting its petition for violation of supervised release is mitigated by the totality of the circumstances in this case. These circumstances include the credit Mr. Zohlman would receive for time served on the revocation petition, the total time he has been in custody, the lack of evidence that he is a danger to others, and the nature of the alleged violation as a Grade C violation. In light of those special circumstances, the Government has not shown by clear and convincing evidence that it has an "essential" or "overriding" interest sufficient to overcome Mr. Zohlman's "interest in avoiding involuntary administration of antipsychotic drugs." *Sell*, 539 U.S. at 178–79 (quoting *Riggins*, 504 U.S. at 134–35).

Of course, an important question is what happens now. Mr. Zohlman's judgment is impaired by mental illness, and his ability to successfully complete a term of supervised release is questionable. His record of past compliance is abysmal. In addition to the federal terms of supervised release, terms of supervision were also imposed as part of eight of his nine state sentences. He

violated the terms of supervision in seven of those cases—for which he served 42 months in state custody—and it appears that he was arrested in this case before he had a chance to violate probation in the eighth state case. (*See* Doc. 68 at 1–2).

In *Sell*, the dissent warned that the restraints the majority placed on involuntary medication could "allow criminal defendants . . . to engage in opportunistic behavior." 539 U.S. at 191 (Scalia, J., dissenting). I am mindful of that warning, but neither that concern nor any other concern pertaining to law enforcement's ability to ensure compliance with supervised release conditions is pertinent here. Mr. Zohlman is irrational, and the rational voice of authority is likely mere noise to him. It may be that Mr. Zohlman will again fail to report to the federal probation office. In that scenario, a future prosecution could be frustrated if he remains incompetent and continues to refuse medication. But today's ruling does not foreclose the possibility of a different result should Mr. Zohlman commit a serious violation of supervised release or another substantive offense. In that case, the Government's interest may be sufficiently strong to warrant involuntary medication.

The last twenty-five years of Mr. Zohlman's life are emblematic of our collective failure to adequately care for mentally ill citizens—a failure too often compounded by imprisoning them. I am troubled about what will happen to Mr.

Zohlman when he is released. There is no evidence that he is a threat to himself or others, but his finding employment and housing will be challenging. Without medication and care, he may soon find himself back in prison. But those concerns—and the fact that more appropriate care is regrettably unavailable—do not justify forcible injection in this case.

For the reasons stated above, Mr. Zohlman's objection (Doc. 164) to the conclusion in the R&R (Doc. 160) that the Government has an important interest in prosecuting his supervised-release violation is **SUSTAINED**. The Government's request that the Bureau of Prisons be permitted to involuntarily medicate Mr. Zohlman is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida, on November ___18th___, 2025.

JOHN ANTOON II
United States District Judge

Copies furnished to:

Counsel for Defendant
United States Attorney

21